# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

| | |
|---|---|
| GRAYSON L.L.C. (OF LOUISIANA), ET AL. | CIVIL ACTION NO. 21-44 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| BPX OPERATING CO., ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before the Court is a motion for partial summary judgment[1] filed by Defendants, BPX Operating Company and BPX Production Company (collectively, "BPX"). Plaintiffs, Grayson L.L.C. of Louisiana and Anderson Exploration Energy Company (collectively, "Plaintiffs") oppose the motion.[2] For the following reasons, BPX's motion is **GRANTED**.

## BACKGROUND

Plaintiffs owned shares of gas wells located in northern Louisiana.[3] To market and sell their gas, Plaintiffs entered into multiple marketing agreements with BPX.[4] The agreements vested BPX with the authority to sell Plaintiffs' gas to marketing companies, pipeline companies, and other purchasers.[5] While BPX did so, Plaintiffs agreed that those sales would "bear a proportionate share" of "any post production expenses" BPX incurred while transporting their gas.[6]

---

[1] Record Document 76.
[2] Record Document 80.
[3] Record Document 76-5 at 1.
[4] *Id.*
[5] Record Document 76-4 at 5, 10, 15, 20, & 24.
[6] *Id.*

1

The parties' marketing relationship lasted about five years before it soured. According to Plaintiffs, issues arose when BPX deducted multiple unreasonable and improper costs from their share of gas proceeds.[7] In response, Plaintiffs brought this action alleging various theories of liability against BPX.[8] Alongside other claims, Plaintiffs allege that BPX breached the parties' agreements because of deductions it assessed for gas transportation.[9] In particular, Plaintiffs claim that BPX violated a federal policy—the shipper-must-have-title rule—while transporting their gas and deducted the costs of that "unlawful" transportation from Plaintiffs' revenue shares.[10]

In response, BPX moves for partial summary judgment to dismiss Plaintiffs' breach of contract claim.[11] While BPX denies it violated any federal regulation, it contends that the shipper-must-have-title rule does not create a private cause of action for Plaintiffs.[12] At the same time, BPX claims that Plaintiffs lack a cause of action within the four corners of the parties' agreements.[13] According to BPX, Plaintiffs agreed that sales made on their behalf would bear a share of *any* post production costs without limitation.[14] It further claims that the deductions of these costs were not dependent on its compliance with federal regulations or policies.[15] As a result, BPX urges the Court to grant summary

---

[7] Record Document 54 at 9 ¶ 23.
[8] *Id.* at 14–27 ¶¶ 39–83.
[9] *Id.* at 21–22 ¶¶ 61(a)–(g).
[10] *Id.* at 22 ¶ 61(g).
[11] Record Document 76.
[12] Record Document 76-2 at 6.
[13] *Id.* at 10.
[14] *Id.* at 11.
[15] *Id.*

judgment and dismiss Plaintiffs' breach of contract claim based on the shipper-must-have-title rule.[16]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. *See id.* at 322–23.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact, the non-movant must demonstrate that there is, in fact, a genuine issue for trial by going "beyond the pleadings and designat[ing] specific facts" for support. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with some metaphysical doubt as to the material facts," by conclusory or unsubstantiated allegations, or by a mere "scintilla of evidence." *Id.* (internal citations and quotation marks omitted). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985) (citing *Adickes v. S. H. Kress & Co.*, 398

---

[16] *Id.*

U.S. 144, 158–59 (1970)). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the non-movant is so "weak or tenuous" that it could not support a judgment in the non-movant's favor. *Armstrong v. City of Dall.*, 997 F.2d 62, 67 (5th Cir. 1993).

## LAW & ANALYSIS

In the United States, natural gas moves through a network of pipelines spanning more than 2.6 million miles. U.S. Dep't of Transp. Pipeline & Hazardous Materials Safety Admin., *General Pipeline FAQs* (Nov. 6, 2018), https://www.phmsa.dot.gov/faqs/general-pipeline-faqs. Building this infrastructure was a feat of human engineering perhaps unfathomable to the Americans who first developed the energy source in the 1820s. In fact, through much of the nineteenth century, transporting natural gas was a challenge for enterprising producers: pipelines were primitive and incapable of carrying the resource long distances. *See PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2252 (2021). By the 1920s, however, "technology improved" and constructing a modern pipeline network "began in earnest." *Id.*

As the pipeline infrastructure developed further, natural gas increasingly began to flow across state lines. In response, Congress moved to regulate the expanding industry and passed the Natural Gas Act ("NGA") of 1938. *Id.* The "primary aim" of the "legislation was to protect consumers against exploitation at the [h]ands of natural gas companies." *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 610 (1944). Other "subsidiary" purposes included "respecting 'conservation, environmental, and antitrust' limitations." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1307 (D.C. Cir. 2015)

4

(quoting *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 n.6 (1976)).  With this in mind, Congress vested the Federal Power Commission—now the Federal Energy Regulatory Commission ("Commission")—with authority to "administer" the NGA.  *PennEast*, 141 S. Ct. at 2252.  Alongside other provisions, the Act empowers the Commission to regulate portions of the natural gas market.  The Commission, for example, establishes policies that govern interstate pipeline transportation.

Among the many of these policies is the shipper-must-have-title rule ("Shipper Rule" or the "Rule").  The Shipper Rule is premised on a straightforward concept: the shipper of natural gas through a pipeline must hold title to the gas it is shipping.  *Bangor Gas Co., LLC v. H.Q. Energy Servs. (U.S.) Inc.*, 695 F.3d 181, 184 (1st Cir. 2012).  Put another way, "the shipper of record and the owner of the gas must be one and the same throughout the course of the transportation or the duration of storage on any pipeline." *In re Atmos Energy Corp.*, 137 FERC ¶ 61,190 (2011), 2011 WL 6523679 at *10.  The Rule is intended to prevent natural gas distributors from buying up large amounts of pipeline capacity they do not need and then leveraging that capacity to price gouge third parties who need access to the market.  *Bangor Gas*, 695 F.3d at 184.  Though the Commission enforces the policy, the Shipper Rule is not found within the Code of Federal Regulations; it arose from a precedent the Commission established in a pipeline-specific tariff proceeding.  *See Tex. E. Transmission Corp.*, 37 FERC ¶ 61,260, at 61,685 (1986); William F. Demarest, Jr., *Gas Marketing by the Operator Under A Joa-Unrecognized Regulatory Risks and Practical Solutions*, 64 Okla. L. Rev. 135, 137 (2012).  Today, the

Shipper Rule applies "generally to the interstate natural gas pipeline industry" by virtue of pipeline tariffs. *Id.*

The Rule was designed to discourage anti-competitive conduct and promote transparency. *Bangor Gas*, 695 F.3d at 189. To help advance these goals, the Commission may impose significant monetary penalties on entities that violate the Shipper Rule. *See* 15 U.S.C § 717t-1. The fines can reach up to $1 million per day, per violation, for as long as the violation continues. *Id.* On that basis, some companies have seen civil fines climb to several million dollars. *See, e.g.*, *In re Constellation NewEnergy - Gas Div., LLC*, 122 FERC ¶ 61,220, at 62,240 (2008) (assessing a penalty of $5 million); *In re Calpine Energy Servs., L.P.*, 119 FERC ¶ 61,125, at 61,827 (2007) (assessing a penalty of $4.5 million). The stiff penalties emphasize how the Commission views violations of the Shipper Rule: as a "fundamental threat to open and non-discriminatory access to interstate transportation capacity." Demarest, *supra*, at 138.

In this case, Plaintiffs argue that BPX violated the Shipper Rule; they explain that BPX never had title to their gas as it was shipped through interstate pipelines because the title remained in their name.[17] This belief comes from "documents" Plaintiffs obtained in 2020—they do not produce these documents in their opposition.[18] In acknowledging the minimal evidence, Plaintiffs explain that BPX has largely refused to respond to discovery that would demonstrate where the title to the transported gas was transferred.[19] BPX, for

---

[17] Record Document 80 at 3.
[18] *Id.*
[19] *Id.* n.7.

its part, denies it ever violated any of the Commission's policies.[20] And even if it did, BPX argues that Plaintiffs have no cause of action arising under the Shipper Rule.[21]

Plaintiffs do not dispute that last point. But this is hardly surprising against the imposing backdrop of relevant case law. Federal courts throughout the country have held that there is neither an express nor implied general right of action to enforce the Commission's regulations.[22] *See, e.g., Columbia Gas Transmission, LLC v. Singh*, 707 F.3d 583, 587 (6th Cir. 2013) (holding that the NGA creates no general private right of action); *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 466 n.26 (5th Cir. 1984) ("[I]t has been held there is no private cause of action under the Natural Gas Act."); *Huey ex rel. Est. of Young v. Duke Energy Carolinas, LLC*, No. 09-1058, 2009 WL 1743904, at *1 (D.S.C. June 18, 2009) ("The [Commission's] regulations do not grant a private cause of action."). Even this Court has once held that "the NGA does not create a general private right of action to counter violations of the Act." *Enable Miss. River Transmission, LLC v. Nadel & Gussman, LLC*, No. 15-1502, 2016 WL 1064640, at *2 (W.D. La. Mar. 14, 2016) (quoting *Columbia Gas*, 707 F.3d 583 at 587). The wealth of authority on this issue underscores a pertinent point: however vital the Commission's policies may be, the power to enforce them lies with the Commission, not private plaintiffs. Even so, Plaintiffs argue

---

[20] Record Document 76-2 at 9.
[21] *Id.*
[22] To be sure, the NGA provides for federal exclusivity when federal law creates causes of actions elsewhere to enforce provisions of the Act. The NGA creates such causes of action in two limited ways: first, the NGA gives the Commission the relatively broad power to seek to enjoin in federal court perceived violations of the NGA or the Commission's orders and regulations. 15 U.S.C. § 717s(a). Second, the NGA grants those entities with certificates from the Commission the limited power to bring in federal court eminent-domain actions against private property within the parameters of its facility. 15 U.S.C. § 717f(h).

that their breach of contract claim arises from the parties' marketing agreements rather than the NGA.

Turning, then, to these five identical contracts, Plaintiffs agreed that BPX "may choose to sell [their gas] to affiliated or unaffiliated marketing companies, pipeline companies, end users or any other purchasers deemed acceptable in [BPX's] sole opinion."[23] While BPX made those sales on their behalf, Plaintiffs further agreed that those sales would "bear a proportionate share of any post production expenses."[24] Under Louisiana law, "post production expenses" are costs "incurred after the production has been discovered and delivered to the surface of the earth." *J. Fleet Oil & Gas Corp., L.L.C. v. Chesapeake Louisiana, L.P.*, No. 15-2461, 2018 WL 1463529, at *6 (W.D. La. Mar. 22, 2018) (citing *Babin v. First Energy Corp.*, 96-1232 (La. App. 1 Cir. 3/27/97), 693 So. 2d 813, 815). Notably, these expenses specifically include costs associated with transporting gas. *Id.*

According to Plaintiffs, BPX breached these agreements by assessing transportation charges incurred while violating the Shipper Rule.[25] It is those assessments of costs by BPX—not its noncompliance with the Commission's regulations—that Plaintiffs argue rendered BPX's violation of the Shipper Rule "incidental" to the agreements.[26] But BPX interprets the contracts differently. In its motion, BPX maintains that the agreements broadly state—without exception—that "sales made on [Plaintiffs'] behalf shall bear" a

---

[23] Record Document 76-4 at 5, 10, 15, 20, & 24.
[24] *Id.*
[25] Record Documents 54 at 22 ¶ 61 & 80 at 9.
[26] Record Document 80 at 9.

8

pro-rata share of "*any* post production expenses."[27] BPX contends that this language is straightforward.[28] Moreover, BPX stresses that no contract provision required it to comply with the Shipper Rule.[29] For these reasons, BPX argues that Plaintiffs have no basis for their breach of contract claim under the parties' agreements.

To interpret contractual language, the Court applies Louisiana law. *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (stating that "[t]o determine issues of state law, we look to final decisions of the state's highest court."). In Louisiana, contracts have the force of law between the parties; this Court is bound to interpret them according to the parties' common intent. La. Civ. Code arts. 1983 & 2045. To determine that intent, the Court need not look beyond the contract language if the words of the contract are clear, unambiguous, and lead to no absurd consequences. La. Civ. Code art. 2046. A contract term is ambiguous "when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction." *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998) (applying Louisiana law). A contract provision is not ambiguous, however, "where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." *Id.*

With these principles in mind, the Court interprets the language of the parties' marketing contracts as "clear and unambiguous." By the contracts' terms, the parties' intent was for BPX to deduct "*any* post production" expenses from the sales it made on

---

[27] Record Document 76-4 at 5, 10, 15, 20, & 24 (emphasis added).
[28] Record Document 76-2 at 12.
[29] *Id.* at 16.

9

Plaintiffs' behalf without caveat.  *See* "Any." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/any (last visited September 6, 2022) (defining "any" as "one or some indiscriminately of whatever kind").  While Plaintiffs may dispute the reasonableness of the post production deductions for other reasons,[30] their acceptance to shoulder their share was not dependent on BPX's compliance with the Shipper Rule.  To be sure, Plaintiffs do not point to any provision that references the Commission, the Shipper Rule, or any of the Commission's regulations.  If anything, Plaintiffs gave BPX broad discretion to market their gas.  If Plaintiffs were concerned about BPX violating the Shipper Rule, it is unclear why the parties could not have incorporated that language into the agreements.  What is clear is that BPX had no obligation to abide by the Shipper Rule under the contracts' unambiguous language.

Despite the agreements' express terms, however, Plaintiffs appeal to "public policy": they contend that "any post production expenses" cannot, as a matter of law, include those incurred in violation of the Commission's regulations.[31]  Otherwise, Plaintiffs argue that BPX would have unfettered authority to assess all post production expenses, regardless of their validity.[32]  On that basis, Plaintiffs maintain that the agreements implicitly incorporated *all* the Commission's regulations, policies, and rules related to natural gas marketing; thus, Plaintiffs believe BPX had an implied obligation to comply

---

[30] Plaintiffs, in fact, do dispute the reasonableness of the costs on grounds other than BPX's violation of the Shipper Rule.  *See* Record Document 54 at 14–20 ¶¶ 39–60.
[31] Record Document 80 at 11.
[32] *Id.* at 14.

with the Shipper Rule while transporting their gas and before assessing transportation deductions.[33]

But Plaintiffs' theory is unconvincing. For one thing, their argument undermines Louisiana law: the Court cannot, by its own volition, graft obligations onto a contract where they never existed. Indeed, "it is not the province of the court to alter by construction or to make new contracts for the parties." *Peironnet v. Matador Res. Co.*, 2012-2292 (La. 6/28/13), 144 So. 3d 791, 808 (cleaned up). Instead, "[t]he duty of the court is confined to the interpretation of the agreements the parties have made for themselves, and, in the absence of any ground for denying enforcement, to give effect to the agreements as made." *Id.* (cleaned up). Having analyzed the contract terms above, the Court cannot stray from the agreements' clear and unambiguous language and impose new obligations to which BPX never agreed.

In addition, Plaintiffs' theory undermines congressional authority. To be sure, Plaintiffs have not cited any holding that a federal regulation "incapable of spawning a private right of action may be enforced between private parties as an implicit contract term." *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 37 (1st Cir. 2007). Courts, in fact, routinely

---

[33] *Id.* at 12. To support their argument, Plaintiffs cite Louisiana case law discussing a range of illicit contracts or unlawful contract terms. *See, e.g.*, *Johnson v. Kilpatrick*, 569 So. 2d 669, 669 (La. Ct. App. 1990) (holding that an agreement between a property owner and public contractor was contrary to public policy because of its illicit cause); *Sensebe v. Canal Indem. Co.*, 2010-0703 (La. 1/28/11), 58 So. 3d 441, 451 (holding that an insurance contract had an exclusion that violated public policy). But Plaintiffs cite no authority holding that federal policies are incorporated into private agreements as a matter of public policy. In any case, the policy purpose of the Shipper Rule is to discourage anti-competitive conduct in the natural gas industry, not to police "post production expense" deductions between private parties. *See Bangor Gas*, 695 F.3d at 184.

reject such arguments, and for good reason. *See, e.g., id.*; *Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 525 (5th Cir. 2002). If the Court strayed from precedent here, it would be, in substance, crafting "a private right of action for violations of [the Shipper Rule]—and thus [] circumvent[ing] the conclusion that the [NGA], and therefore the regulations enacted pursuant to it, creates no private right of action for the wrong of which [Plaintiffs] complain[]." *Casas*, 304 F.3d at 525.

For example, suppose the Court allowed Plaintiffs to hold BPX accountable under the Shipper Rule based on an "implied contract term." In that case, Plaintiffs could theoretically enforce the Commission's entire regulatory scheme absent an express agreement. To be sure, "[t]here is nothing to distinguish the regulation at issue here from the mine-run of federal regulations touching upon" natural gas marketing. *Buck*, 476 F.3d at 37. And by extension, all contracting parties in the natural gas industry could thwart congressional intent using a trojan horse: they could recover damages under the Commission's regulations by alleging "breach of contract" to bypass the NGA. *See Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minnesota LLC*, 843 F.3d 325, 329 (8th Cir. 2016) ("[N]othing in the NGA expressly creates a cause of action for breach of contract.").

In essence, that is what Plaintiffs attempt to do here. But the Court "will not countenance [that] flagrant undermining of [the implied right of action] doctrine that the plaintiffs invite." *Casas*, 304 F.3d at 525. Therefore, the Court will not permit Plaintiffs to circumvent the NGA or to conjure up a right of action where one never existed. *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("[I]t is most certainly incorrect to say that

language in a regulation can conjure up a private cause of action that has not been authorized by Congress."). Because the parties did not agree to incorporate the Shipper Rule into their agreements, and because Plaintiffs cannot enforce the Shipper Rule otherwise, Plaintiffs' breach of contract claim cannot survive summary judgment; so, as a matter of law, the Court must grant BPX's motion.

In doing so, Plaintiffs argue that the Court is allowing BPX to avoid complying with relevant laws and regulations applicable to natural gas marketing. Contrary to Plaintiffs' belief, however, the Court's holding does not endorse violating federal regulations with impunity. While the NGA does not provide Plaintiffs a right of action to enforce the Commission's policies, the "unavailability of private enforcement is not the same as the unavailability of any enforcement at all." *Buck*, 476 F.3d at 37. Notably, "[i]f Congress had intended for private actors . . . to have broad enforcement powers under the [NGA], Congress could have easily given private actors such powers." *Columbia Gas*, 707 F.3d 583 at 588. But it did not. And without contractual language dictating otherwise, Plaintiffs cannot enforce the Commission's regulations through a backdoor.

## CONCLUSION

For the above reasons, BPX's motion for partial summary judgment is **GRANTED**. Plaintiffs' breach of contract claim predicated on BPX's violation of the Shipper Rule in Paragraphs 61(a)–(g) of their Amended Complaint is **DISMISSED with prejudice**.

**THUS DONE AND SIGNED** this 20th day of September, 2022.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

13